UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM HALL,

                Plaintiff,

      vs.                                1:10-CV-1120
                                       (NAM/CFH)

COUNTY OF SARATOGA, JOHN DOE,
Individually and in his capacity as an Employee
of the County of Saratoga, New York, Sheriff's
Department and the Saratoga County Sheriff,
LT. CORBET, JANE DOE, the persons intended
being all Civilian personnel as employees or under
Contract as independent medical personnel,

                Defendants.
_____

APPEARANCES:                      OF COUNSEL:

Grasso, Rodriguez & Grasso           Nicholas J. Grasso, Esq.
751 State Street
Schenectady, New York 12307-1266
*Attorneys for Plaintiff*

Bailey Kelleher & Johnson, P.C.        Nannette R. Kelleher, Esq.
Pine West Plaza 5, Suite 507
Washington Avenue Extension
Albany, New York 12205
*Attorneys for Defendants*

**Norman A. Mordue, United States District Judge**

MEMORANDUM-DECISION and ORDER

I.      INTRODUCTION

       This action arises under the auspices of 42 U.S.C. § 1983.  Plaintiff asserts that while he

was an inmate at the Saratoga County Correctional Facility ("SCCF"), defendants denied him

adequate medical care, committed a battery upon him and are liable in negligence for personal

injuries he sustained while in their custody.  Defendants have moved for summary judgment

dismissing the complaint.  Plaintiff has not submitted papers in opposition to this motion.[1]

II.    DISCUSSION

A.     Standard of Review

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

When, as here, a summary judgment motion is unopposed, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996); *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co., Inc.*, 373 F.3d 241, 244 (2d Cir. 2004).  Instead, a court must (1) determine what material facts, if any, are disputed in the record presented on the motion; and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the moving party.

---

[1] The Court's Docket indicates that defense counsel initially served plaintiff's counsel, Mr. Grasso, with the present motion papers via the Court's mandated electronic filing system ("CM/ECF") system, unaware that he is exempt from use of the ECF system as he has been in practice for over fifty years.  Mr. Grasso contacted the Court on September 12, 2012, requesting an extension due to his exemption and the fact that he had just received notice that a dispositive motion had been filed.  Though defendants opposed his request, the Court granted Mr. Grasso's request for a thirty day extension to prepare responsive papers.  Mr. Grasso did not file his response papers as ordered by October 12, 2012.  On October 19, 2012, this Court received additional correspondence from defense counsel requesting that no further extensions be granted to Mr. Grasso and that the pending motion for summary judgment be granted in its entirety.  Mr. Grasso did not respond to this correspondence.  The Court granted the former request and denied the latter pending review of the motion on its merits.  The Court has had no further communication with Mr. Grasso.

*See Champion*, 76 F.3d at 486. The motion may fail if the movant's submission fails to establish that no material issue of fact remains for trial, *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001), or if the "undisputed facts fail to show that the moving party is entitled to judgment as a matter of law," *Vt. Teddy Bear*, 373 F.3d at 244 (internal citation and quotation marks omitted).

B.    Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions of confinement. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

"'Conditions of confinement' is not a term of art; it has a plain meaning." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). "It quite simply encompasses all conditions under which a prisoner is confined for his term of imprisonment." *Id.* These include terms of disciplinary or administrative segregation such as keeplock or solitary confinement, as well as more general conditions affecting a prisoner's quality of life such as . . . the deprivation of exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution. *Id.* (citing *Figueroa v. Rivera*, 147 F.3d 77, 82 (1st Cir. 1998); *Channer v. Mitchell*, 43 F.3d 786, 788 (2d Cir. 1994)) (*per curiam*). In short, any

3

deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement.

In *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), the Second Circuit "read together," *Macias v. Zenk*, 495 F.3d 37, 41 (2d Cir. 2007), a number of decisions and consolidated cases and formulated a three-part test for examining the scope of the PLRA's exhaustion requirement:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill*, 380 F.3d at 686.

New York State law provides a three tier inmate grievance procedure applicable to plaintiff's claims. *See*, N.Y. Correct. Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1 *et seq*. (2003). Courts in the this Circuit have long recognized this procedure as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112–13 (2d Cir. 1999)). Richard Emery, the Chief Administrator with the rank of Colonel for SCCF submitted an affidavit wherein he averred that the facility maintained an inmate grievance program established by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to the above-referenced law and

regulations. Further, Emery stated that the grievance program is enumerated in the policies and procedures of SCCF and is distributed to each inmate in an Inmate Handbook. Review of the complaint and the entire record for that matter reveals no suggestion that plaintiff filed or attempted to pursue a grievance of his claims administratively at SCCF prior to filing the instant action.

Regarding part two of the *Hemphill* analysis, plaintiff does not allege in the complaint or anywhere in the record that defendants inhibited his ability to utilize the grievance program which was indisputably available to him at SCCF. Finally, review of the record does not reveal any "special circumstances" which would justify plaintiff's failure to comply with administrative requirements prior to filing the present federal claim. *See Hemphill*, 380 F.3d at 686. Thus, the Court finds there is no genuine issue of material fact concerning plaintiff's failure to have exhausted administrative remedies prior to commencing his § 1983 claims against defendants. Based thereupon, these federal claims are subject to dismissal on procedural grounds.

C.      Plaintiff's Claims Under 42 U.S.C. § 1983

1.      Inadequate Medical Treatment

Even if the Court ignored plaintiff's procedural failings, his § 1983 claims fare no better on their merits. According to the complaint and his response to interrogatories filed in this matter, plaintiff claims that defendants violated the Eighth Amendment when failed to provide adequate medical care to him while he was an inmate at SCCF by: 1) failing to comply with care and treatment consistent with the diagnosis of renal failure; 2) failing to address the plugging of an A.V. fistula in his left arm in a timely fashion despite his complaints about it, putting a shunt in his neck; 3) not allowing him to shower or bathe for eight days which led to a septic infection;

and 4) failing to follow a special diet of low calcium, phosphorous and potassium which was recommended by plaintiff's physician, Dr. Daoui and the Rubin Dialysis Center.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). The Eighth Amendment also applies to prison officials when they provide medical care to inmates. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To establish an unconstitutional denial of medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Id.* at 104.

The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). *See Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) (standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain") (citations omitted). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson*, 501 U.S. at 298. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nevertheless, a pattern of

6

omissions may permit the inference of deliberate unconcern for the prisoner, and gross negligence by prison employees creates a strong presumption of deliberate indifference. *Doe v. New York City Department of Soc. Servs.*, 649 F.2d 134, 143–44, 145 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983); *Langley v. Coughlin,* 715 F.Supp. 522, 537 (S.D.N.Y. 1989). Furthermore, a health provider cannot claim to have exercised his or her "best judgment" where that judgment is based on a cursory examination or inadequate diagnostic procedures. *Williams v. United States*, 747 F.Supp. 967, 1009 (S.D.N.Y. 1990). Finally, prison officials cannot defend practices that fall below the norm of what is generally accepted in the medical community merely on the ground that such practices are common throughout the correctional system. *See Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir. 1977).

Stephen Strader, the Medical Director at SCCF, who oversees all medical personnel at SCCF and participates in the care and treatment of all inmates at the facility, submitted an affidavit detailing the medical care provided to plaintiff during the relevant time period. According to Dr. Strader, plaintiff entered the facility on December 1, 2008, on a driving while intoxicated charge. Thus, he was automatically subject to monitoring for ETOH withdrawal. An Inmate Physical Assessment Form completed at the time of his arrival indicated that plaintiff was being treated for Stage IV Renal Disease. Dr. Strader explained that chronic renal disease is the gradual loss of kidney function which can occur over months or years. According to Dr. Strader, Stage IV is considered the most severe stage of the disease; it is usually irreversible and will often progress to complete kidney failure. At that point, Dr. Strader explained, the kidneys can no longer adequately filter waste and excess fluids from the body and dangerous levels of fluids, electrolytes and wastes can accumulate. Dr. Strader stated that the only option available to

patients at this stage of kidney disease is dialysis or renal transplant.

Dr. Strader noted that when an inmate enters SCCF with a chronic disease such as plaintiff's, the facility obtains the inmate's medical records when possible and facilitates continuing treatment by local specialists in accordance with security policies. According to Dr. Strader, inmates are transferred to all outside medical provider appointments by the Saratoga County Sheriff's Department road patrol unless emergency ambulatory services are required. Dr. Strader averred that review of plaintiff's medical records confirmed the diagnosis of Stage IV chronic kideny disease or renal failure and a medical evaluation by plaintiff's nephrologist prior to his incarceration evidenced worsening renal failure. Dr. Strader noted that when plaintiff entered SCCF, he had an A.V. fistula already in place. Dr. Strader explained that an A.V. fistula is essentially an artificial vein that connects directly to an artery. Dr. Strader stated that A.V. fistulas are commonly created surgically to be used for dialysis treatments. According to Dr. Strader, plaintiff's A.V. fistula was inserted in 2007 due to his progressing kidney disease and anticipation that dialysis would be necessary in the future.

Within the first few days of plaintiff's incarceration, SCCF contacted plaintiff's nephrologist, Dr. Daoui to determine when he would have to be seen and what treatment was necessary. According to Dr. Strader, Dr. Daoui advised that plaintiff would need monthly blood work to monitor his kidney function and electrolyte levels. Dr. Daoui asked that the results of the bloodwork be faxed to his office for review. Plaintiff saw Dr. Daoui for evaluation on January 9, 2009. Dr. Strader averred that in the course of his duties as the facility physician, he reviewed Dr. Daoui's notes and recommendations following each visit. Dr. Strader also stated that while it was his practice to defer to specialist recommendations, he maintained final authority over the

8

medical treatment provided to inmates. Dr. Strader stated that his review of the notes from plaintiff's follow-up evaluation with Dr. Daoui on March 9, 2009, revealed worsening kidney function in the months prior to plaintiff's incarceration and Dr. Daoui's observation that plaintiff would likely soon need dialysis.

On May 11, 2009, Dr. Strader averred that Dr. Daoui recommended that plaintiff adhere to a low potassium diet. Dr. Strader understood this recommendation to require that plaintiff avoid eating excess potassium. According to Dr. Strader, limiting one's potassium intake is necessary in advanced stages of kidney disease. This is because when one's kidney's are failing, it leads to the inability to maintain a normal potassium level as the kidneys begin to lose the ability to remove potassium from the blood. Dr. Strader stated that it was likely that the base diet provided to plaintiff at SCCF already contained lower levels of potassium than he would be ingesting outside the facility. Notably, Dr. Strader opined that "when a renal patient is placed on a low potassium diet, it is because his kidneys have already failed thereby leading to the inability to maintain normal potassium levels. A high potassium diet will not cause kidney failure." Nevertheless, as Dr. Daoui did not prescribe a specific level of potassium intake for plaintiff, SCCF medical staff advised the kitchen staff to restrict plaintiff's meals so they did not include overly high levels of potassium. Dr. Strader stated that SCCF also continued monitoring plaintiff's metabolic blood panel and electrolytes to gauge whether his kidney functions were worsening and unable to maintain normal potassium levels.

Dr. Strader also stated that in his May 9, 2009, office note, Dr. Daoui recommended that plaintiff start hemodialysis. Indeed, the Court notes that in the May 9, 2009, note, Dr. Dauoi changed plaintiff's diagnosis to "'CKD' [or chronic kidney disease] stage 5." However, on May

17, 2009, days before plaintiff's dialysis was to start, he complained that the fistula in his left arm had stopped working. Dr. Strader averred that while he was not a nephrologist, he had a medical understanding of how fistulas are used, complications that can arise with a fistula, and what procedures may be needed to correct those complications. According to Dr. Strader, one complication that can arise is that a fistula can clot or clog which prevents fluid from passing through it. Dr. Strader's review of plaintiff's medical records revealed that a clot or clog in plaintiff's A.V. fistula had occurred at least one time before he entered SCCF. Dr. Strader stated that a clogged or clotted fistula is not a life threatening condition and it is unlikely to cause any pain to a patient. When it occurs, Dr. Strader stated that a nephologist will examine the fistula to determine if a surgical revision will need to be performed. If the patient is on dialysis, Dr. Strader stated that a temporary catheter is placed to allow continuing dialysis pending repair of the fistula.

When plaintiff complained that his fistula had stopped working, a nurse at SCCF contacted Dr. Daoui to see how he would like to proceed as plaintiff was scheduled to begin dialysis. Dr. Daoui recommended that a temporary catheter be placed to allow dialysis to proceed while the fistula was repaired. Dr. Strader said that he then scheduled a fistulogram, a procedure used to determine whether any fluid can pass through a fistula, for the beginning of June. On May 21, 2009, Dr. Strader stated that plaintiff underwent a procedure at Saratoga Hospital for the insertion of a temporary right internal jugular tunnel hemodialysis catheter. Following this procedure, Dr. Strader averred that Dr. Dempsey at Saratoga Hospital contacted SCCF and expressed concern regarding plaintiff being returned to the general inmate population with the catheter in place. Dr. Dempsey recommended that plaintiff be taken out of the general population to reduce the risk that the catheter would be pulled out which could cause plaintiff to bleed to

10

death before medical help could arrive. Though plaintiff strenuously objected to the restriction, Dr. Strader stated that plaintiff was separated from the general population and placed on medical watch unit.

Dr. Strader stated that following the catheter insertion on May 21, 2009, showering restrictions were placed on plaintiff because it was deemed medically necessary to keep the catheter site dry. On May 28, 2009, SCCF medical staff were advised by plaintiff's specialists at the Rubin Dialysis Center that he could resume showering and the restriction was lifted. Plaintiff began his dialysis treatments on May 29, 2009, and received a total of 17 dialysis treatments between then and the time of his release from the facility in July 2009.

Dr. Strader opined to a reasonable degree of medical certainty that the treatment plaintiff received at SCCF did not hasten his kidney disease and did not cause his fistula to become clotted. Rather, according to Dr. Strader, the care and treatment provided to plaintiff at SCCF was in compliance with all accepted standards of care and in compliance with the recommendations of plaintiff's own specialists. Overall, Dr. Strader said that plaintiff's blood pressure and weight were monitored weekly and at times daily during his six month incarceration and blood work was performed once to twice monthly to monitor his kidney function and electrolyte levels. Plaintiff's medical records confirm Dr. Strader's statement that plaintiff was evaluated three times by his nephrologist and was in daily contact with the medical staff at SCCF. Dr. Strader averred:

> His medications were constantly monitored, he was placed on a restricted diet[], and relocated to a medical unit to ensure his safety. [Plaintiff's] records evidenced that his kidney was [sic] worsening with each visit to his nephrologist before he entered SCCF. [Plaintiff] received the same care for his renal disease while at SCCF that he would have received had he not been incarcerated. I can affirm to a reasonable medical certainty that it was not [plaintiff's] incarceration

which resulted in his requiring dialysis, but the natural progression of his disease.

a.    Treatment of Plaintiff's Fistula

Turning to plaintiff's claims of inadequate medical care, plaintiff alleges that defendants "fail[ed] to address the plugging of the A.V. fistula in his left arm in a timely fashion."  Plaintiff testified at a 50-h hearing and at his deposition in connection with this matter that defendants waited five to six weeks to treat the clogged fistula.  Notably, plaintiff did not allege or testify that the clogged fistula caused him extreme pain and there is no medical evidence in the record which indicate that the failure to treat plaintiff's condition immediately as he requested would or could have resulted in "death, degeneration or extreme pain."  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance*, 912 F2d at 607).  Based thereupon, defendants are correct when they argue that there is no evidence to support plaintiff's claim that failure to act immediately to remedy his clogged fistula, in and of itself, was a deprivation "sufficiently serious" to warrant review under the Eighth Amendment.  *Wilson v. Seiter*, 501 U.S. at 298.

Nevertheless, even if a clogged fistula is a serious medical condition under the standard described in *Nance*, *supra*, the record here reveals that defendants' treatment of the problem was reasonable and in accordance with the directives of Dr. Daoui.  Plaintiff alleges that SCCF's actions in evaluating the clogged fistula took too long and caused him to have a catheter inserted. However, it was Dr. Daoui who recommended insertion of the catheter to ensure plaintiff's dialysis treatments could start as scheduled.  Plaintiff believes that he should have had the fistula repaired immediately instead of having to undergo placement of the catheter.  However, it is well settled that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate

grounds for a Section 1983 claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151

F.Supp.2d 303, 312 (S.D.N.Y. 2001). "These issues implicate medical judgments and, at worst,

negligence amounting to medical malpractice, but not the Eighth Amendment." *Id.* (citing *Estelle*

*v. Gamble*, 429 U.S. at 107

b.    Inadequate Diet

The intentional failure to provide an inmate with a medically prescribed diet for a

prolonged period of time can state a viable Eighth Amendment claim. *Abdush–Shahid v.*

*Coughlin*, 933 F.Supp. 168, 180 (N.D.N.Y. 1996) (citing *Robles v. Coughlin*, 725 F.2d 12, 15 (2d

Cir.1983) (Eighth Amendment's prohibition against cruel and unusual punishment requires

serving inmates nutritionally adequate food prepared and served under conditions that do not

present imminent danger to health and well-being of inmates who consume it)). However, the

"objective component" of an Eighth Amendment claim requires a plaintiff to show evidence of

some adverse health impact caused by the discontinuance of or failure to provide the prescribed

diet. *Davidson v. Desai*, 817 F.Supp.2d 166, 190 (W.D.N.Y. 2011).

Plaintiff asserts that defendants failed to follow the special diet of low calcium,

phosphorous and potassium recommended by his doctor and the specialists at the Rubin Dialysis

Center. However, there is no evidence in the record that Dr. Daoui ever ordered that plaintiff's

intake of calcium and phosphorous be limited. Indeed, the only restriction Dr. Daoui placed on

plaintiff's diet was "low potassium." The record shows that once, Dr. Daoui placed this

restriction on plaintiff's diet, the facility kitchen was made aware of the restriction and plaintiff's

diet was altered. Although plaintiff asserts that his diet was not properly altered, defendants are

correct when they contend that plaintiff's blood levels were continuously monitored and Dr.

Daoui made no changes based on his subsequent review of plaintiff's laboratory results. Thus,

there is no evidence that plaintiff received an inadequate diet while incarcerated at SCCF. Moreover, there is no objective evidence that the alleged inadequacy of his diet caused any worsening of his health or renal condition. As referenced above, Dr. Strader opined that high levels of potassium do not cause kidney failure. Rather, Dr. Strader noted that plaintiff's inability to maintain normal potassium levels was due to the natural progression of his kidney disease.

c.      Showering Restriction

Plaintiff asserts that he was not allowed to shower for several days after placement of the catheter for dialysis and that this caused a "septic infection." Regardless of whether restriction of shower privileges for the time period in question rises to level of denial of a serious medical need, there is no evidence in the record that plaintiff ever developed any type of septic infection while incarcerated at SCCF. Indeed, while plaintiff testified at his 50-H hearing that he got a septic infection at the site of the catheter placement and was "in the hospital for four days," the Court finds no record of such a hospital visit or infection his medical records. Moreover, the showering restriction was implemented at the instruction of plaintiff's specialists at the Rubin Dialysis Center who ordered that the catheter site be kept dry. On the day that medical personnel at SCCF were advised by the Rubin Dialysis Center that plaintiff could resume showering, the restriction was lifted.

d.      Overall Treatment of Plaintiff's Renal Disease

Plaintiff contends that the care he received at SCCF resulted in his requiring dialysis and was not in his "best interest." However, as referenced above, plaintiff entered the facility with Stage IV renal disease and his medical records demonstrate that his condition was worsening in the months just prior to his incarceration. Plaintiff arrived at SCCF with an A.V. fistula because his physician anticipated that he would soon require dialysis. Within three months of entering the

facility, Dr. Daoui noted that plaintiff's bloodwork warranted a change in his diet and the initiation of hemodialysis. The record fully supports defendants' contention that it was the natural progression of plaintiff's disease, not the care or treatment he received at SCCF, which led to his requiring dialysis. There is nothing in the record which suggests that plaintiff's care and treatment at SCCF was not in accordance with generally accepted medical principles and the advice and recommendation of his own specialists.

Consequently, there are no material questions of fact concerning plaintiff's claims of inadequate medical treatment under the Eighth Amendment and these claims must be dismissed.

2.      Excessive Force

Defendants contend that while plaintiff's complaint did allege a claim for deliberate indifference to his medical needs, he did not assert a claim under 42 U.S.C. § 1983 for excessive force. Defendants argue that even if his complaint was deemed to include a claim of excessive force under § 1983, it would still fail. "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v.Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." *Id.* (quoting *Hudson*, 503 U.S. at 7.)

In this case, plaintiff's complaint alleges simply that defendant Corbett struck him in the face with a dish, milk and other objects. The complaint does not assert that plaintiff suffered any injury as a result of this incident. In his response to interrogatories, plaintiff asserts further that on May 11, 2009, "Lt. Corbett committed an assault on [him] by intentionally smashing a plate of food against the edge of a table and hitting [plaintiff] in the face with it and then throwing a glass

of milk in his face causing [plaintiff] reasonable apprehension of the immediate harmful and offensive contact, which was the food and milk hitting [his] face." However, in the Court's record, plaintiff's interrogatory responses are not complete and it is unclear whether they are signed or sworn to by plaintiff. At his 50-H hearing, plaintiff testified that he was "not real happy that Lieutenant Corbett threw that plate of food in my face and a glass of milk." Following this answer, there is only one additional page of testimony provided by defendant in which plaintiff testified further concerning the incident:

> I wasn't real happy about the shunt being put in my neck, and I told them that they lied to me and I wasn't pleased with it, and I told him, and I said, Give me a phone. I'll call my lawyer and I'll have this thing out of my neck tomorrow, and he smashed a plate of food into my face and threw a glass of milk at me and said, Do you know how much money they've spent on you upstairs over that? And I said, I don't care.

When plaintiff was asked what he meant when he said that Corbett "smashed a plate of food into [his] face," he said "The plate was sitting on the table, and we were arguing back and forth across the table, and he smashed it on the edge and it flipped up in my face."

In an affidavit submitted in connection with defendants' motion, Lt. Corbett averred:

> [Plaintiff] had recently returned from Saratoga Hospital, where he had a catheter inserted in his neck. . . . [Corbett] was advised by the on-duty nurse, R.N. Bilka, that [plaintiff] became angry upon learning that he was to be separated from general population. . . . As [plaintiff] was extremely agitated about this move, [Corbett] was asked to speak with him to attempt to calm him down.

Corbett further stated that when he entered plaintiff's cell, he was "quite angry." "[Plaintiff] claimed that the hospital had lied to him by telling him that he could remain in general population. [Plaintiff]'s anger continued to escalate and he began yelling and threatened to remove the catheter himself."

16

> There was a metal table in the room that held [plaintiff]'s plate of food with a glass of milk. I sat across the table from [plaintiff] and reminded him that he was being separated from general population for his own safety. [Plaintiff's] temper was further escalated and I went to leave the holding cell to afford him the opportunity to calm down. When I rose from the table, my hand accidently knocked into [plaintiff]'s glass of milk, spilling milk on both [plaintiff] and me. I had [plaintiff] moved to another holding cell so that the cell could be cleaned while he had a chance to calm down.
>
> . . .
>
> I understand that [plaintiff] has now alleged that I assaulted him by throwing the glass of milk at him during this incident. At no point, did I intentionally cause milk to spill on [plaintiff.] Had I acted in an aggressive manner towards [plaintiff] during that incident and physically assaulted him, the matter would have been reviewed by SCCF administration. Further, at no point did [plaintiff] complain of our interaction during his incarceration. . . .

The force plaintiff describes herein not sufficiently serious or harmful to reach constitutional dimensions. *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993). Plaintiff does not maintain that he experienced any pain or injury as a result of the milk or food being allegedly thrown in his face, even assuming the incident occurred as he states. Moreover, plaintiff does not allege facts that show that Lt. Corbett used force "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline" or calm him down and prevent him from removing his catheter. *Hudson*, 503 U.S. at 7. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.*" Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Indeed, not even "every **malevolent** touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. (emphasis added). Plaintiff has therefore not stated facts that meet either the objective or subjective component of the test used to determine whether Lt. Corbett's alleged excessive physical force constituted cruel and unusual punishment.

D.     Qualified Immunity

Even if the above were not true, Lt. Corbett and the other individually named defendant are also protected against plaintiff's various § 1983 claims by qualified immunity. As noted recently in the Supreme Court case of *Pearson v. Callahan*,--- U.S.----, 129 S.Ct. 808, 815 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. *551, 567 (2004) (KENNEDY, J., dissenting) (citing Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

For example, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard," because of the uncertainty and rapidity inherent in police work. *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). Indeed, *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim which include analysis of the crime at issue, the threat posed by a suspect and any attempt by the suspect to evade or resist arrest. *See id.* If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *See id.* "[T]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), overruled on other grounds, *Pearson, supra*:

> It is sometimes difficult for an officer to determine how the relevant

legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* Indeed:

[O]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson [v. Creighton*, 483 U.S. 635 (1987)] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Id.* at 206 (emphasis added).

In the circumstances presented to defendant Corbett who was asked to attempt to calm plaintiff who was threatening to pull out his catheter which medical personnel said could cause him to bleed to death, he was justified in using a degree of force to prevent plaintiff from harming himself. However, Lt. Corbett averred that no such force was necessary and that the spilled milk was simply an accident. While plaintiff's 50-H testimony indicated that defendant Corbett intentionally spilled milk and food on him, the Court's conclusion that no cause of action lies here is confirmed by the "uncontested fact that the force was not so excessive that [plaintiff] suffered hurt or injury." *See Saucier, supra*, 533 U.S. at 208.

At the very least, defendants Buttofocco and Smith have established that reasonably competent police officers could disagree on the question of excessive force in this case. Based thereupon, the motion by defendants to dismiss plaintiff's claim of excessive force on the alternative ground of qualified immunity must be granted.

E.     State Law Claims

1.     Battery

Defendants assert that plaintiff's cause of action for battery is barred by the statute of limitations. The normal statute of limitations for battery is one year. *See* N. Y. C.P.L.R. § 215 (3). However, in this case, the defendant is a municipal subdivision so the one-year period is extended per General Municipal Law by 90 days. *See* N.Y. Gen. Municipal Law 50-i. Thus, plaintiff was required to file his complaint within one year and ninety days from the date the alleged battery occurred. Here, plaintiff testified at his 50-H hearing that the battery occurred on the "day that [he] got the shunt put in [his] neck," which his medical records establish was May 21, 2009. Plaintiff testified that the incident with Lt. Corbett happened "as soon as he returned from the hospital," for the outpatient procedure. Plaintiff filed his Summons and Complaint in New York Supreme Court for Saratoga County on August 26, 2010. Accordingly, plaintiff's complaint was filed one year and 96 days after the alleged battery occurred. As such, the Court agrees his action for battery is time-barred as a matter of law and must be dismissed.

2.     Negligence

Plaintiff claims that defendants were negligent in failing to address his medical needs at SCCF in three ways: first, that they ignored refused to follow the dietary restrictions set by his nephrologist, Dr. Daoui; second, that they failed to timely address his A.V. fistula; and third, that they refused to allow him to shower following his catheter surgery which resulted in a septic infection. Fatal to plaintiff's claims is the absence of any expert medical evidence submitted in support of thereof. "Whether the claim is grounded in negligence or medical malpractice, '[w]here medical issues are not within the ordinary experience and knowledge of lay persons, expert medical testimony is a required element of a *prima facie case*' " *Myers v. State of New*

*York,* 46 A.D.3d 1030, 1031 (3d Dep't 2007) (citing *Tatta v State of New York*, 19 A.D.3d 817, 818 (3d Dep't 2005), *lv. denied* 5 N.Y.3d 712 (2005) quoting *Wells v State of New York*, 228 A.D.2d 581, 582 (2d Dep't 1996), *lv denied* 88 N.Y.2d 814 (1996); *see Trottie v State of New York*, 39 A.D.3d 1094, 1095 (3d Dep't 2007)). In *Myers*, the claimant inmate contended that medical personnel at the Sullivan Correctional Facility erred in the treatment of his knee injury by delaying necessary surgery. 46 A.D.3d at 1030. Specifically, the claimant alleged that he was required to undergo physical therapy, which he contended worsened his condition, instead of knee surgery, despite the medical personnel's knowledge that he had a foreign object lodged in his knee. *See id.* Following a trial, at which claimant was his only witness, the Court of Claims, in a written decision, dismissed the claim. *See id.* at 1030-31.

Plaintiff's claims of medical negligence are likewise subject to dismissal. Setting aside the proof offered by SCCF that its treatment of plaintiff was entirely reasonable and within the standards of care established by his own specialists, plaintiff has offered no expert medical evidence demonstrating that SCCF deviated from accepted standards of medical care and treatment in this case. Based thereupon, his claims of negligence or malpractice must be dismissed.

III.    CONCLUSION

Based on the foregoing, it is therefore

ORDERED that defendants' motion for summary judgment (Dkt. #24) is hereby GRANTED and it is further

ORDERED that the complaint is dismissed in its entirety.

IT IS SO ORDERED.

Date: March 5, 2013
Syracuse, New York

_____
Honorable Norman A. Mordue
U.S. District Judge